UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. |
| | ) | |
| FUNDS IN THE AMOUNT OF $130,000 | ) | |
| UNITED STATES CURRENCY; and | ) | |
| | ) | |
| FUNDS IN THE AMOUNT OF | ) | |
| $53,000 UNITED STATES CURRENCY, | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |

## **VERIFIED COMPLAINT FOR FORFEITURE**

COMES NOW, before this honorable Court, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to the provisions of Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Fed. R. Civ. P. Supp.") G(2), respectfully, to bring this Verified Complaint for Forfeiture *In Rem.*

Plaintiff hereby alleges as follows:

### **Nature of the Action**

1.      This is a civil action brought to forfeit property seized by the United States government for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2.      This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3.     This civil action *in rem* is brought to forfeit property pursuant to the provisions of 21 U.S.C. § 881(a)(6), 18 U.S.C. §§ 981(a)(1)(A), and 981(a)(1)(C), because it:  (1) was involved in, (2) was used or intended to be used to facilitate, (3) was furnished or intended to be furnished in exchange for, or (4) is proceeds (or property) traceable to, a "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7)(A).

4.     Based upon the facts and circumstances herein set forth, Plaintiff prays: (1) that process issue for an arrest warrant *in rem*  for the subject property; (2) that notice be given to all parties to appear and show cause why forfeiture should not be decreed; (3) that this Court enter a judgment of forfeiture to the United States; and (4) that this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

5.     This complaint is verified by the attached affidavit of Drug Enforcement Administration ("DEA") Task Force Officer Mark Brunzie ("TFO Brunzie"), which is fully incorporated herein.

### The Defendant *In Rem*

6.     The Defendant *in rem* consists of the following property:

- $130,000 (one hundred and thirty thousand dollars); and

- $53,000 (fifty-three thousand dollars) in United States currency.

(Hereinafter, the "subject property").

7.     The subject property was seized on December 15, 2018, by the Drug Enforcement Administration ("DEA") Group 24 Task Force ("Group 24") operating out of Midway International Airport in Chicago, Illinois ("Midway Airport"), to which Task Force Officer Mark Brunzie ("TFO Brunzie") is assigned.

8.     The subject property is currently in the custody of the United States Marshals Service.

## Jurisdictional Statement

9.     This Court has jurisdiction over an action commenced by the United States of America, and pursuant to 28 U.S.C. § 1355(a) because this is an action for forfeiture.

10.     This Court has *in rem* jurisdiction over the subject property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395(a) (via 28 U.S.C. § 1355(b)(1)(B)) because the subject property is located in this district.

11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395 (via 28 U.S.C. § 1355(b)(1)(B)) because the subject property is located in this district.

## Basis for Forfeiture

12.     The subject property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it: (1) was "furnished or intended to be furnished" in exchange for a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801, *et seq*. (the "Controlled Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

13.     The subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, "dealing in a controlled

substance" under 18 U.S.C. § 1961(1)(A) and "interstate and foreign travel or transportation in aid of racketeering enterprises" under 18 U.S.C. § 1952 – "specified unlawful activit[ies]" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

14.     The subject property is subject to forfeiture pursuant to 21 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from "proceeds traceable" to "dealing in a controlled substance" under 18 U.S.C. § 1961(1)(A) and "interstate and foreign travel or transportation in aid of racketeering enterprises" under 18 U.S.C. § 1952 – "specified unlawful activit[ies]" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

## Summary of Facts

15.     On December 15, 2018, DEA Group 24 conducted a consensual interview and search at Midway Airport, which led to the discovery and seizure of the subject property from Hweih Ahmad Elabed ("Hweih") and Rayan Ahmad Elabed ("Rayan"), passengers traveling together with an Individual A on a one-way ticket via Southwest Airlines flight number 4029 from LaGuardia Airport in New York to Midway Airport Chicago, Illinois.

16.     A police canine certified with the National Police Canine Association (NPCA) demonstrated as a positive alert on the subject property, indicating the presence of one of five odors he is trained to detect.

17.     Based upon the experience of DEA Group 24 officer, including TFO Brunzie, and the totality of the circumstances further described below, the subject property was seized for forfeiture.

**Facts**

I.     Airport Interdiction and Discovery of the Subject Property

     A.   Overview of DEA Group 24 at  Midway

18.     This Complaint describes an investigation conducted by members of DEA Group 24 at Midway Airport, to which TFO Brunzie is a member.

19.     The primary responsibility of Group 24 is to investigate crimes involving the use of commercial airlines and shipping companies to transport illegal drugs and drug proceeds.

20.     Based upon the experience of Group 24 investigators and in similar investigations across the United States, it is common knowledge that cities in the mid-west and east coast are demand locations for illicit drugs.

21.     Person(s) involved in the illegal drug trade, often hire couriers to transport drugs and or proceeds from the sale of drugs by utilizing commercial airlines and shipping companies.

22.     In an effort to identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, suspicious flight itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

23.     Factors that constitute suspicious flight itineraries include airfare purchase at the counter immediately prior to departure or short notice reservations for one-way travel, sometimes paid in cash.

24.     In addition, Group 24 investigators know it is common for couriers to utilize a third party credit card to purchase airfare and to provide inaccurate or not in-service telephone numbers to airline companies.

5

25. Couriers travel with minimal or no luggage and often attempt to board the aircraft at the last possible moment.

26. Drug and/or money couriers utilize these techniques in an attempt to conceal their identities from law enforcement and minimize their exposure to commercial airlines.

B. Interview with Passenger Hweih

27. On December15, 2018, DEA Chicago Group 24 agents received information from DEA Special Agent George Burdzy ("SA Burdzy") assigned to the New York Field Division with regard to the suspicious travel itinerary of Hweih.

28. SA Burdzy informed Chicago Group 24 he was notified by Transportation and Safety Administration (TSA) at LaGuardia International Airport in New York that a Southwest Airline passenger traveling to Chicago Midway International Airport was in possession of $50,000 United States Currency.

29. DEA Chicago Group 24 was informed that the passenger's name was Hweih Elabed and his date of birth was August 6, 1988.

30. Hweih was on Southwest Airline flight number 4029 arriving at Midway at 7:00p.m. The one-way ticket was purchased less than 10 hours before the flight was scheduled to depart. Rayan made the purchase for $156.98.

31. Based upon the training and experience of Group 24 investigators, illegal drug couriers often purchase airline tickets one day or so prior to the scheduled departure.

32. Group 24 investigators also know New York to be a known source area for illegal drug trafficking.

33. Further, Group 24 investigators also know that those who transport illegal drugs,

or the proceeds of illegal drug trafficking, often keep them on their person or accompanying bags or suitcases.

34.     As such, Group 24 investigators sought to interview Hwieh prior to exiting Southwest Airline flight number 4029.

35.     At approximately 7:00p.m., Group 24 investigators established surveillance near Southwest Airlines gate B11 at Midway Airport, the inbound gate from LaGuardia New York flight number 4029, in an attempt to interview Hweih.

36.     At the time, the investigators were dressed in civilian clothing with no weapons, radios, or other law enforcement paraphernalia visible.

37.     Shortly thereafter, TFO Brunzie approached a male subject believed to be Hweih.

38.     TFO Brunzie identified himself as law enforcement by displaying credentials and badge.

39.     The unknown male was told by TFO Brunzie that he was not under arrest and was not in any kind of trouble.

40.     At that time, TFO Brunzie asked the male subject which agreed to speak to agents.

41.     TFO Brunzie noticed the subject was in possession of a blue in color 'Travel Select' roller bag.

42.     TFO Brunzie asked to see a form of photo identification and a boarding pass.

43.     The male subject produced an Indiana driver's license bearing the name Hweih Ahmad Elabed, which bore a photo likeness. The subject now known as Hweih located and handed over his boarding pass.

44.     TFO Brunzie noted the information and handed the identification back to Hweih.

45.     When asked where and the purpose of his travel, Scerbo stated he was traveling to San Francisco and Eureka, California.

46.     At this time, TFO Brunzie asked Hweih if he purchased his ticket.

47.     Hweih replied "No" and said his brother Rayan purchased his ticket along with Individual A.

48.     TFO Brunzie asked Hweih when was his ticket purchased.  Hweih replied a few days prior.

49.     TFO Brunzie asked Hweih where he was traveling.  Hweih replied he was traveling from New York.

50.     When ask`ed how long he was in New York, Hweih replied for a few days.

51.     TFO Brunzie asked Hweih if his trip was for business or pleasure, Hweih said he was there for business.

52.     When asked what type of business, Hweih stated he owns a cell phone company in Indiana with his brother Rayan. Then Hweih went on to say he was meeting a client in New York to sell them their inventory of cell phones and electronics.

53.     TFO Brunzie asked Hweih where he was staying while in New York, Hweih stated he stayed with family.

54.     When asked again how long he stayed in New York, Hweih replied for a few days.

55.     TFO Brunzie asked Hweih what airline he originally flew from Chicago to New York, Hweih advised Southwest Airlines.

8

56.     Hweih was asked by TFO Brunzie if he checked any luggage which he replied "No".

57.     TFO Brunzie asked Hweih if he was traveling with any carry-on luggage and Hweih said "Yes", and presented a blue in color 'Travel Select' bag.

58.     When TFO Brunzie asked Hweih if he packed all the contents in his luggage himself, he paused and replied "Yes."

59.     Hweih was asked by TFO Brunzie if he had any weapons, such as knives, firearms or needles in any of his luggage or on his person, which he responded "No."

60.     TFO Brunzie asked Hweih if he had marijuana and/or any illegal narcotics or paraphernalia inside his luggage or on his person, which Hweih responded "No."

61.     Hweih was asked if he had any electronics on him or in his bag, which he replied he had three cell phones on him.

62.     TFO Brunzie asked Hweih if he was carrying any large amounts of United States Currency, gift cards or money orders on his person or in his bag. Hweih replied "Yes" and went on to say he was stopped by the Transportation Security Administration ("TSA") in New York because of his money.

63.     When asked how much money he was carrying by TFO Brunzie, Hweih stated he was in possession of $50,000.

64.     TFO Brunzie asked Hweih how was the Currency stored in his roller bag, Hweih replied the Currency was in a small blue bag and banded together.

65.     When asked by TFO Brunzie who banded the Currency, Hweih replied he did.

C.  Discovery of Hweih's Property

66. TFO Brunzie asked Hweih if officers could search his carry-on bag to verify his statements. Hweih agreed.

67. Hweih handed his carry-on shoulder bag to DEA Task Force Officer Anthony Terranova. TFO Terranova searched the roller bag in front of him, and initially located a blue zipper bag which contained five (5) bundles of United States Currency.

68. TFO Brunzie asked Hweih where the United States Currency came from. Hweih replied that the money came from the sale of phones to his client in New York.

69. When asked by TFO Brunzie if he had any receipts or itemized bills showing this sale, Hweih stated that his brother Rayan handles all the invoices and deliveries.

70. TFO Terranova secured the United States Currency from Hweih's roller bag and gave it to TFO Brunzie. TFO Terranova then went to assist Task Force Officer Scott Opelt with Rayan.

71. TFO Brunzie asked Hweih if Rayan was carrying any United States Currency, Hweih replied "No".

72. Hweih was asked by TFO Brunize if he had the address or contact in New York. Hweih stated he did not know the client's name, but that his brother Rayan did.

73. At this time, Hweih bagan to scroll through his phone on the WhatsApp. Hweih showed TFO Brunzie the address in New York on where they met the client. Hweih said it was the address to the client's cell phone store in Flushing, New York.

74. TFO Brunzie googled the address which came back to an apartment complex in Rego Park. When he ask Hweih about this, Hweih did not answer.

75.     Hweih was asked by TFO Brunzie who was the picture of on the WhatsApp. Hweih stated that the picture was of his cousin (Individual B) whom he was meeting in New York and who introduced him and Rayan to the client.

D.  Interview with Passenger Rayan

76.     TFO Opelt approached the male subject believed to be Rayan, from the side and identified himself to him including displaying his official credentials and badge.

77.     TFO Opelt requested to talk to the subject who was allowed to inspect the credentials and badge before TFO Opelt put them away. TFO Opelt advised the subject he was not under arrest, was not in any kind of trouble and was free to leave.

78.     The male subject understood and agreed to speak with Agents.

79.     TFO Opelt asked the subject to see a form of photo identification and a boarding pass. The subject produced a United States passport bearing the name Rayan Ahmad Elabed, which bore photo likeness. Rayan also provided a baggage claim ticket.

80.     TFO Opelt noted the information and handed the documents back to the subject now known as Rayan Elabed.

81.     Rayan was asked about his travel itinerary by TFO Opelt and the purpose of the travel. Rayan stated that he was traveling to Chicago from New York.

82.     When asked by TFO Opelt if he was traveling for business or pleasure, Rayan advised he had been with family in New York while doing business.

83.     TFO Opelt asked Rayan what type of business he had in New York. Rayan advised he was in the business of shipping cell phones to Dubai, United Arab Emirates.

84.     Rayan was asked by TFO Opelt if he had any checked luggage for the flight. Rayan advised he had one checked bag. Rayan was carrying a blue duffel bag.

85.     TFO Opelt asked Rayan if he packed his bags himself.  Rayan advised he did.

86.     When asked by TFO Opelt if anyone had given him anything to transport on his trip or asked him to take anything with him, Rayan responded in the negative.

87.     TFO Opelt asked Rayan if he had anything in any of his bags that would have caused any type of screener to question the content of his bags.  Rayan advised he did not.

88.     Rayan was asked by TFO Opelt if any of his bags contained anything with wires or switches. Rayan advised they did not.

89.     TFO Opelt asked Rayan he was carrying any weapons of any kind.  Rayan replied he was not.

90.     Rayan was asked by TFO Opelt if he was carrying any weapons of any kind.  Rayan replied he was not.

91.     TFO Opelt asked if Rayan was carrying any illegal drugs or carrying prescription medication not in his name.  Rayan advised he was not.

92.     When asked by TFO Opelt if he was carrying any large amounts of United States Currency, Rayan hesitated and advised he was.

93.     Rayan then asked what TFO Opelt meant by large amounts.  TFO Opelt elaborated by asking Rayan if he had any excessively large amounts of cash in any of his bags.  Rayan advised approximately $130,000 or $140,000 in his carry-on bag.

94.     TFO Opelt asked Rayan the purpose for carrying such a large amount of money. Rayan advised it was payment for the sale of cellular phones and electronics he had shipped overseas to Dubai.

E.  Discovery of Rayan's Property

95.     When asked by TFO Opelt for consent to search his carry-on bag, Rayan provided verbal consent.

96.     TFO Opelt conducted a search of Rayan's carry-on duffel bag and located thirteen bundles of United States Currency concealed within clothing in the bag.

97.      Rayan explained when asked how he obtained the currency by TFO Opelt that his customers pay him through a middleman in New York for shipments of cell phones and electronics in Dubai.  Rayan continued to advise the customers usually pay by wire transfer, but they sometimes pay in cash.

98.     Further explaining to TFO Opelt, Rayan advised he happily accepts cash when available, as he has to pay his suppliers in cash.

99.     Rayan also advised his business is going well, as most of his competitors had been shut out of the United States banking system.

100.    TFO Opelt asked him to elaborate.  Rayan advised the banks find all of the cash transactions suspicious, and suspect money laundering.

101.    Rayan showed TFO Opelt a banking app on his phone, showing numerous withdrawal transactions over $100,000.

102.    Further explaining to TFO Opelt, Rayan advised there are numerous cash and wire transactions in his accounts for over $100,000.

13

103. TFO Opelt advised Rayan that money laundering is a legitimate banking concern. Rayan advised he was aware as he had been approached in the past by drug trafficking organizations to launder money for them, but he declined.

104. Rayan advised the drug trafficking organizations that had approached him had always wanted to launder money through China, not Dubai.

105. When asked the name of his business, Rayan produced a credit card bearing the name of "We Buy N Sell Inc."

106. TFO Opelt asked if Rayan had any documentation of the business transaction that resulted in the cash payment he was transporting that day.

107. Rayan scrolled through numerous messages in his phone and eventually produced what appeared to be an invoice to a company in Dubai for $210,150.00 in electronics.

108. When asked how much currency his brother was traveling with by TFO Opelt, Rayan advised approximately $55,000.

109. TFO Opelt asked Rayan why the sum of cash did not add up to the $210,150.00. Rayan advised they do not always receive full payment for every shipment.

110. Further explaining to TFO Opelt, Rayan advised he did not make the pickup and that his brother Hweih picked up the money.

111. TFO Opelt asked Rayan where the transaction took place. Rayan advised he did not know, as his brother handles the transactions.

112. Rayan advised he is a co-owner of the business with his brother Hweih.

F.     Extended Interview of Hweih and Rayan

113.   TFO Terranova subsequently spoke to Rayan and asked who handled the inventory with the sale in question.

114.   According to Rayan, Hweih handled the invoices and paperwork.

115.   TFO Terranova asked Rayan what was the name of the person they were meeting in New York to make this sale. Rayan stated he did not know the name of the person, but "they" text a driver license picture of the person who they are meeting.

116.   Subsequently, TFO Terranova went back to Hweih and informed him what his brother Rayan had just said. TFO Terranova noticed that Hweih was scrolling through his phone and asked to see it.

117.   TFO Terranova read the WhatsApp messages between Hwieh and an unknown person.

118.   TFO Terranova asked what this conversation was about which Hwieh stated the conversation was about the buyer for his phones.

119.   According to TFO Terranova, the WhatsApp conversation had to do with picking up United States Currency and nothing mentioned about cellphones. According to the text messages on Hweih's phone, Hweih was in negotiations with someone about getting United States Currency every week.

120.   Hweih's text messages read, Hweih was getting $130,000 a week but wanted more. Hweih went on to say that Individual B was in New York and can pick up the money but Hweih wanted at least $200,000.

15

121.     Hweih text messages stated that if he can get $300,000 a week from New York that he will cut out Individual B and deal directly with an unknown person.

122.     TFO Terranova took several pictures of the conversation with the permission of Hweih.  Photographs are attached as Government Group Exhibit 1.

123.     When asked by TFO Terranova if he ever been arrested, Hweih replied "No."  TFO Terranova asked if Hweih was sure?  Hweih said there was an argument with a customer in which the police were called, but he was not arrested.

124.     Hweih further explained he had to attend classes for the case to be dismissed.

125.     TFO Brunzie reminded Hweih of his drug arrests in 2014 and 2015.  Hweih said he was not arrested and beat "that" in court, referring to the charges.

126.     Agents advised Hweih that he had made conflicting statements to those of Rayan.

127.     Based on the aforementioned information provided by Hweih and Rayan, TFO Brunzie informed them that the United States Currency from their bags were going to be detained for further investigation.

128.     Hweih and Rayan were informed that they could accompany Agents to the Midway DEA Chicago Police Department airport office to obtain a receipt or have it mailed.

129.     Both subjects agreed to accompany Agents to the office.

130.     Once at the office, TFO Brunzie photographed evidence of Hweih's bag of large withdrawals receipts from Chase bank.

131.     TFO Brunzie asked Hweih if the withdrawals were from his business account. Hweih replied "Yes".

132.    Receipts were provided to both Hweih and Rayan for the Currency seized from their carry-on bags.

E. Canine Examination of the Subject Property

133.    TFO Terranova utilized the Glen Ellyn Police Department certified narcotics detection canine, Madden, to examine the currency in Hweih's and Rayan's possession.

134.    Madden was last certified on October 2, 2018 by the Chicago Police Department.

135.    Madden is trained and certified to detect five odors:  (1) marijuana, (2) cocaine, (3) heroin, (4) ecstasy, and (5) methamphetamine.

136.    If at any time during a search Madden smells one of the five odors he is trained to detect, Madden will alert with an active/passive alert at the area where he smells the odor.

137.    Madden's search sniff was conducted on December 15, 2018 at the parking garage at Midway Airport.

138.    At the time of the search/sniff at the parking garage, there were vehicles, pest traps, parking rails, a stairwell and doors.  Madden did not alert meaning this area was free from the odor of narcotics.  TFO Brunzie and TFO Opelt then placed the suspect United States Currency within this same area.

139.    TFO Terranova directed Madden to search/sniff, and Madden alerted by sniffing intensely on and around the United States Currency exhibiting a change of behavior.  Madden sat and stared behind a wire guardrail, pinpointing the source of narcotic odor.   TFO Brunzie advised that was the location of Hweih's currency.

140.    Shortly thereafter, TFO Terranova directed Madden to search/sniff the aforementioned area again.  Madden sniffed intensely on, under, and around the parking block and

17

exhibiting a change of behavior. Madden sat and stared down at the parking block, pinpointing the source of narcotic odor. TFO Opelt advised that was the location of Rayan's currency.

F. Subsequent Pennsylvania Seizure of $204,050 from Hweih

141. On January 24, 2019, at approximately 10:00p.m., Special Agent Joseph Begley ("SA Begley") from Scranton, Pennsylvania Group 54 received a telephone call from Pennsylvania State Police Trooper Ryan Kelley ("Trooper Kelley"). Trooper Kelley stated uniformed Pennsylvania State Police Trooper Christopher Isbitski ("Trooper Isbitski") seized a large amount of United States Currency because of a traffic stop for speeding near Milton, Pennsylvania from Hweih. Trooper Kelley stated the suspect was a current target of a DEA investigation out of Chicago, Illinois.

III. Administrative Forfeiture Proceeds

142. On February 11, 2019 and February 12, 2019, DEA initiated administrative forfeiture proceedings against the currency seized from Hweih and Rayan at Midway Airport by mailing a Notice Letter and Notice of Seizure to all potential interest holders by certified mail.

143. On February 21, 2019, Hweih and Rayan through their attorney Victor F. Ciardelli filed an administrative claim with DEA for funds in the amounts of $53,000 and $130,000.

144. On March 11, 2019, DEA referred this matter to the United States Attorney's Office in Chicago to initiate judicial forfeiture proceedings.

145. On March 25, 2019, DEA initiated administrative forfeiture proceedings against the currency seized from Hweih in Milton, Pennsylvania. The Middle District of Pennsylvania is the processing district to initiate forfeiture proceedings on the seizure of the $204,050 United States Currency.

**First Cause of Action**

146.    Plaintiff repeats and realleges the averments in paragraphs one through 94 as though fully set forth herein.

147.    For the reasons set forth above, the subject property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it: (1) was "furnished or intended to be furnished" in exchange for a controlled substance or listed chemical in violation of Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801, *et seq.* (the "Controlled Substances Act"), (2) represents "proceeds traceable" thereto, or (3) was "used or intended to be used to facilitate" a violation thereof. *See* 21 U.S.C. § 881(a)(6).

148.    Pursuant to 21 U.S.C. § 881(a)(6), "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [21 U.S.C. §§ 801-904], all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of [thereof]" are subject to forfeiture to the United States. *Id*.

**Second Cause of Action**

149.        Plaintiff repeats and realleges the averments in paragraphs one through 94 as though fully set forth herein.

150.        For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§  1956, 1957, or 1960; to wit, "dealing in a controlled substance" a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

19

151.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of 1956, 1957 or 1960 of [Title 18], or any property traceable to such property," is subject to forfeiture to the United States.

152.    Pursuant to 18 U.S.C. § 1956:

 (3)Whoever, with the intent—
(A) to promote the carrying on of specified unlawful activity;
(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
(C) to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

153.  The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

154.  The list of offenses under § 1961(1)(A) are further defined as "racketeering activity," and include "any act or threat involving . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year[.]" *See* 18 U.S.C. § 1961(1)(A).

**Third Cause of Action**

155.  Plaintiff repeats and realleges the averments in paragraphs one through 94 as though fully set forth herein.

156.  For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it: (1) was "involved in," or (2) is "property traceable" to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956, 1957, or 1960; to wit, interstate and foreign travel or transportation in aid of racketeering

20

enterprises in violation of 18 U.S.C. § 1952, a "specified unlawful activity" under 18 U.S.C.

§ 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

157.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a

transaction in violation of 1956, 1957 or 1960 of [Title 18], or any property traceable to such

property," is subject to forfeiture to the United States.

158.        Pursuant to 18 U.S.C. § 1956:

> (3) Whoever, with the intent—
> (A) to promote the carrying on of specified unlawful activity;
> (B) to conceal or disguise the nature, location, source, ownership, or control
> of property believed to be the proceeds of specified unlawful activity;
> or
> (C) to avoid a transaction reporting requirement under State or Federal law,
> conducts or attempts to conduct a financial transaction involving property
> represented to be the proceeds of specified unlawful activity, or
> property used to conduct or facilitate specified unlawful activity, shall
> be fined under this title or imprisoned for not more than 20 years, or
> both.

159.    The term "specified unlawful activity" means "any act or activity constituting

an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

160.    The list of offenses under § 1961(1)(A) are further defined as "racketeering activity,"

and include "any act which is indictable under . . . section 1952[.]" *See* 18 U.S.C. § 1961(1)(A).

161.    Section 1952(a) describes the following as an indictable act:

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any
> facility in interstate or foreign commerce, with intent to—
>  (1) distribute the proceeds of any unlawful activity; or
>  (2) commit any crime of violence to further any unlawful activity; or
>  (3) otherwise promote, manage, establish, carry on, or facilitate the promotion,
> management, establishment, or carrying on, of any unlawful activity[.]

18 U.S.C. § 1952(a).

162.    Section 1952(b) further describes "unlawful activity" as, "any business enterprise

involving . . . narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act)[.]".

## Fourth Cause of Action

163.  Plaintiff repeats and realleges the averments in paragraphs one through 94 as though fully set forth herein.

164.  For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to "dealing in a controlled substance," a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

165.  Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c))" is subject to forfeiture to the United States. See 18 U.S.C. § 981(a)(1)(C)(2018).

166.  The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." See 18 U.S.C. § 1956(c)(7).

167.  The list of offenses under section 1961(1)(A) are further defined as "racketeering activity," and include "any act or threat involving . . . dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year[.]" See 18 U.S.C. § 1961(1)(A).

## Fifth Cause of Action

168.  Plaintiff repeats and realleges the averments in paragraphs one through 94 as

22

though fully set forth herein.

169.     For the reasons set forth above, the subject property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952 ([i]nterstate and foreign travel or transportation in aid of racketeering enterprises), a "specified unlawful activity" under 18 U.S.C. § 1961(1)(A) (by way of 18 U.S.C. § 1956(c)(7)(A)).

170.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c))" is subject to forfeiture to the United States. *See* 18 U.S.C. § 981(a)(1)(C)(2018).

171.     The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." *See* 18 U.S.C. § 1956(c)(7).

172.     The list of offenses under section 1961(1)(A) are further defined as "racketeering activity," and include "any act which is indictable under . . . section 1952[.]" *See* 18 U.S.C. § 1961(1)(A).

173.   Section 1952(a) describes the following as an indictable act:

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—
> (1) distribute the proceeds of any unlawful activity; or
> (2) commit any crime of violence to further any unlawful activity; or
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity[.]

18 U.S.C. § 1952(a).

174.   Section 1952(b) further describes "unlawful activity" as, "any business enterprise involving . . . narcotics or controlled substances (as defined in section 102(6) of the Controlled

23

Substances Act)[.]"

## Prayer for Relief

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1) That process issue for an arrest warrant *in rem* for the subject property, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2) That due notice be given to all parties to appear and show cause why forfeiture of the subject property to the United States in accordance with the claims herein set forth should not be decreed;

3) That this Court enter a judgment of forfeiture for the subject property to the United States; and

4)   That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

DATED this 22nd day of May 2019.

JOHN R. LAUSCH, JR.
United States Attorney
For the Northern District of Illinois

By:    *Jeffrey R. Borup*

JEFFREY R. BORUP
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
Desk: (312) 697-4087
Email: jeffrey.borup@usdoj.gov

Attorneys for Plaintiff
United States of America

25









< 15  ██████████████  ⬛◻  📞

last seen today at 7:14 PM

have to deal with once person.

6:36 PM ✓✓

When will we see this talk?  6:51 PM

We're are u in New York  9:27 PM ✓✓

62-60 99 st  Rego Park Ny 11374

9:32 PM

+1 (917) 624-1076

Bara

9:34 PM ✓✓

Call me or he will call.  9:37 PM

No call him  9:57 PM ✓✓

If I call now he does not sleep.

10:07 PM

Ya u can call now  10:26 PM ✓✓

I talked to your man already.

10:27 PM

We agreed on tomorrow.  10:27 PM

Ok thanks what's the amount ?

11:42 P  ⌄

Monday

+  ⬭  ◎  🎤

< 15

another.

4:51 PM

Ok that's fine   5:29 PM ✓✓

You did not give me the answer.
5:52 PM

When do you want to come?
5:52 PM

I can t leave until tomorrow so it won't
be till Monday night
6:27 PM ✓✓

If u can collect 200 I will wait and
come get the 200 all at once
6:28 PM ✓✓

My cousin is in New York he can go
pick up the money anytime from u
but I really need 200 that's why I'm
asking u if u can collect more
6:29 PM ✓✓

If your cousin is in New York. Let's do
it twice.
6:31 PM

I, too, must give to the Others at
once, I cannot do so much.   6:33 PM

Ya but if u just give to me I can tal
300 every week from u then you only
have to deal with once person.

+



7:54 · · ·ll LTE

< 15

last seen today at 7:14 PM

What's the amount  1:36 PM ✓✓

130  3:37 PM

This amount will suit you.  3:38 PM

If u can do more it will be better
3:48 PM ✓✓

I will try to.  3:51 PM

If u can get 200 by tue  8:07 PM ✓✓

Sat, Dec 8

Hi  8:54 PM

You can tell me exactly when you
come.  8:55 PM

I can let u know tomorrow  9:37 PM ✓✓

Maximum Monday  9:39 PM

I have a client very much.  9:41 PM

Ula  asked what to give you, I
strongly respect Ula  and for that I
give you.  9:42 PM

Tomorrow early Tell me please what